UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DORIANN ARMSTRONG,

            Plaintiff,

       v.                                 Case No. 20-C-356

ANDREW SAUL,

            Defendant.

---

**DECISION AND ORDER AFFIRMING DECISION OF THE COMMISSIONER**

---

     Plaintiff Doriann Armstrong filed this action for judicial review of a decision by the Commissioner of Social Security denying her application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Armstrong contends that the decision should be reversed because the administrative law judge (ALJ) erred by formulating a residual functional capacity (RFC) and hypothetical question to the vocational expert (VE) that overstated her mental and physical abilities. For the reasons that follow, the Commissioner's decision will be affirmed.

## BACKGROUND

     Armstrong filed applications for disability insurance benefits and supplemental security income on July 30, 2015, alleging disability beginning November 1, 2013, when she was 33 years of age. R. 33, 335–44. She listed post-traumatic stress disorder (PTSD), anxiety, depression, and memory issues as the conditions limiting her ability to work. R. 384. After her applications were denied initially and upon reconsideration, she submitted a request for a hearing before an ALJ.

R. 33.  On November 19, 2018, ALJ Guila Parker conducted a video hearing at which Armstrong, who was represented by counsel, and a vocational expert (VE) testified.  *Id*.

At the time of the hearing, Armstrong was 38 years old, divorced, and living with her seven-year-old son in a trailer next door to her mother's house.  R. 59–62.  She has an associate degree in architecture and worked after graduation doing computer-aided drafting (CAD) at Hamilton Scientific.  R. 60, 63–64.  She later worked in another position performing CAD but stated she was fired because the person who hired her was stealing from the company.  R. 70.  She testified that the computers created a lot of anxiety and she hated working with them, so she switched focus to become a teacher.  R. 65.  Armstrong worked at two daycare providers while going to school in Milwaukee, as well as in a daycare at the YMCA, but then concluded that it made no sense for her to go to school to become a teacher because she wanted to return to Kewaunee and she thought there would be no teaching jobs for her there.  R. 66–68, 70.  She went to work for East Shore Industries as an adult personal care aide, during which she would sometimes lift adults, with assistance, to and from toilets and wheelchairs.  R. 68–69.  After November 2013, the alleged onset of disability, Armstrong attempted working part time at a boutique, but left after "three to six months" because she described feeling "a lot of anxiety."  R. 71.

When questioned by counsel about why she began having difficulty with work in 2013, Armstrong described a history of abuse.  R. 72.  Armstrong testified that she was emotionally, physically, and sexually abused as a child by family members.  She testified she had been raped at age 14.  R. 73.  She also described an abusive husband she married only two months after meeting him.  R. 75.  Her husband was in the service at the time and was sent overseas shortly after their marriage.  *Id.*  Armstrong testified that, when he returned from serving overseas in the military, he had "really bad" PTSD.  R. 72.  She described him as violent and verbally abusive and said she

2

was afraid for herself and her son. *Id*. Armstrong testified that, in 2013, her husband headbutted her and broke her nose. R. 77. She testified that, after they separated in 2014, there were disputes over child custody and visitation and threats of violence that led her to obtain a restraining order against her husband in 2016. R. 78, 87. Much of her frustration seemed to revolve around the court proceedings surrounding custody and placement of her son. R. 77–78. She stated that, although she thought it would get better after they divorced, her anxiety has gotten worse because she feels that she cannot protect her son, who she described as upset and violent after visiting his father. R. 78. She testified that she believed her husband was violent with their son, but she was unable to convince the guardian ad litem or the judge that he should be denied visitation. R. 80, 82–83. Armstrong described going to therapy and trying to learn coping skills but also testified that she has panic attacks, is afraid of men, and dislikes going out into public. R. 80.

In a sixteen-page decision dated December 12, 2018, the ALJ concluded that Armstrong was not disabled. R. 33–48. The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA). At step one, the ALJ found that Armstrong met the insured status requirements of the Social Security Act through March 31, 2014. R. 35. She determined that Armstrong had not engaged in substantial gainful activity since November 1, 2013, the alleged onset date. *Id*. At step two, the ALJ found that Armstrong had the following severe impairments: obesity; PTSD; affective disorder (alternatively diagnosed as major depressive disorder and dysthymic disorder); anxiety disorder not otherwise specified; attention deficit hyperactivity disorder (ADHD); and a learning disorder. R. 35–36.

At step three, the ALJ found that Armstrong did not have an impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 36. The ALJ concluded that Armstrong has moderate

3

limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting. R. 37–38. The ALJ then assessed Armstrong as having the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except that she should not work at unprotected heights or around dangerous moving machinery. R. 38. Armstrong's RFC included the following additional limitations:

> Mentally, she is able to understand, remember, and carry out simple instructions. The claimant can work in a low stress job, defined as one that requires only occasional work-related decisions and involves only occasional changes in the work setting. She is also capable of work that does not require more than occasional computer use for the performance of job tasks. She can occasionally interact with supervisors, co-workers, and the public. In addition, the claimant can perform work that does not impose fast-paced production quotas.

R. 38–39. At step four, the ALJ found that Armstrong was unable to perform any past relevant work. R. 46. At step five, the ALJ determined that, based on the testimony of the VE and considering Armstrong's age, education, work experience, and RFC, Armstrong could successfully adjust to other representative occupations, such as kitchen helper, mail clerk, and pricing clerk, that exist in substantial numbers in the national economy. R. 47–48. The ALJ therefore concluded that Armstrong was not disabled under the Social Security Act from November 1, 2013, through the date of her decision. R. 48. The Appeals Council denied Armstrong's request for review of the ALJ's decision, making that decision the final decision of the Commissioner of Social Security for her case. R. 1.

**LEGAL STANDARD**

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process,

4

the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of the Social Security Administration. Judicial review of the decisions of the Commissioner, like judicial review of decisions of other administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof; a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence that the claimant can hold a full-time job. Such evidence, in most cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record)."). To repeat, "[t]he issue before this court is whether

5

the ALJ's findings were supported by substantial evidence, not whether [the claimant] is disabled." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Mental RFC and Hypothetical Question

Armstrong claims that the ALJ erred in assessing her RFC and in formulating the hypothetical question posed to the VE. More specifically, Armstrong contends that the ALJ failed to incorporate her limitations in the broad functional areas of concentration, persistence, and pace into the RFC and hypothetical question.

"As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). The responsibility for assessing a claimant's RFC in a case that proceeds to a hearing lies with the ALJ. 20 C.F.R. § 404.1546(c). The assessment of a claimant's RFC is based on "all the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3).

As the Commissioner argues, the ALJ appropriately considered the objective medical evidence. The ALJ noted that Armstrong had generally conservative treatment. R. 41. She was prescribed medication for anxiety and depression beginning in 2012. At times, her medications were changed or adjusted, but the ALJ noted that it did not appear that medication changes occurred frequently, a fact that reasonably suggests they were generally effective. R. 40 (citing

treatment notes). Armstrong's responses on an April 2016 personality test demonstrated that she was satisfied with herself and that she was not experiencing marked distress, and that, as a result, she saw little need for changes in her behavior. *Id.* (citing R. 148). The ALJ noted that treatment notes from the same period describe Armstrong as anxious and state that "she became discouraged at challenging tasks; however, she always continued the task." *Id.* (citing R. 737). The personality assessment showed that Armstrong was quick to feel that she was being treated inequitably and that she often held grudges, which the examiner felt would probably cause her to be seen by others as hostile. The ALJ also noted that the examiner found that "certain indicators on this test fell outside of the normal range, suggesting that she may not have answered in a completely forthright manner, which could lead the evaluator to form a somewhat inaccurate impression." *Id.* (citing R. 863). According to the report, "[t]here were also subtle suggestions that the claimant attempted to portray herself in a negative or pathological manner in particular areas." R. 40–41 (citing R. 863). By March 2018, Armstrong reported to her therapist that she was doing well and felt much calmer. R. 40 (citing R. 956).

The ALJ noted that a series of situational stressors contributed to Armstrong's increased mental symptoms, including interactions with her now ex-husband and problems with her son. R. 41 (citing R. 495, 550, 903). Armstrong had relationship problems with her now ex-husband in 2013. Treatment notes from July 2013 state that these relationship issues contributed to her reported increase of depression and anxiety symptoms. *Id.* (citing R. 495). Disputes over visitation in September 2017 also triggered frequent panic attacks. *Id.* (citing R. 550). It appears that she continued to have court dates related to child custody and visitation through at least the end of 2017. *Id.* (citing R. 566). Armstrong reported increased panic attacks when the guardian ad litem in her family court case modified the restraining order with her ex-husband in September 2018.

*Id.* (citing R. 903). On the other hand, the ALJ noted that in April 2018 Armstrong "presented with a good mood when she found a car she could afford with low miles and high miles per gallon." *Id.* (citing R. 947). She was still concerned about her ongoing family court case but was not as hysterical or hopeless as she had been in the past. *Id.*

The ALJ further noted that mental status examinations were largely normal, documenting goal-directed thought process; good eye contact; and normal mood, affect, and speech. R. 40–41 (citing R. 495, 550, 954). Armstrong also presented as calm, cooperative, and interactive; neatly dressed; and well groomed. R. 41 (citing R. 550, 954–55). Although some examinations noted an abnormal or anxious mood, she maintained normal speech and a normal thought process. *Id.* (citing R. 922–23, 941). Examinations generally failed to document concentration or memory difficulties. R. 37–38 (citing R. 495, 550, 737, 864, 923, 941, 954–55).

Armstrong does not dispute this evidence. She does not claim that the ALJ misrepresented the record or ignored entire lines of evidence relating to the severity of her impairments. Instead, Armstrong contends that the RFC determined by the ALJ is inconsistent with the finding that Armstrong had moderate limitations in the broad functional area of CPP. In large part, Armstrong's argument seems to be that the ALJ did not reasonably weigh the medical opinion evidence bearing on her RFC. Her argument is unconvincing.

The Mental Residual Functional Capacity Assessments (MRFCA) by the state agency reviewing consultants, Jack Spear, Ph.D., and Stacey Fiore, Psy.D., to whose opinions the ALJ assigned "great weight," R. 43, provide strong support for the RFC assessed by the ALJ. Both found that Armstrong was "not significantly limited" in her ability to understand, remember, and carry out very short and simple instructions. R. 162, 179. Based upon these opinions, the ALJ reasonably determined that Armstrong was "able to understand, remember, and carry out simple

9

instructions." R. 38. Both state agency consultants likewise found that Armstrong's abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances were not significantly limited, as were her abilities to sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and to make simple work-related decisions. R. 162, 179. These findings thus supported the ALJ's determination that Armstrong could "work at a low stress job, defined as one that requires only occasional work-related decisions and involves only occasional changes in the work setting." R. 38. Drs. Spear and Fiore's findings that Armstrong was "moderately limited in her ability to interact appropriately with the general public, but not significantly limited in her ability to accept instructions and respond appropriately to criticism from supervisors and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," R. 163, 180, supported the ALJ's finding that she could at least "occasionally interact with supervisors, co-workers, and the public." R. 38–39. The ALJ then added as a further limitation that Armstrong could perform work that "does not impose fast-paced production quotas," R. 38, "consistent with her treatment and reports of increased panic attacks with stress." R. 42.

Drs. Spear and Fiore commented in the narrative sections of the MRFCAs they completed that Armstrong "would be able to focus to complete tasks requiring 2 to 3 steps but would have increasing difficulty with more complex tasks." R. 162–63, 179–80. Armstrong criticizes the ALJ for not including this language in the RFC. As the Commissioner points out, however, "there is no requirement that an RFC must verbatim track a medical opinion the ALJ considers." Def.'s Br. at 11, Dkt. No. 20 (citing *Betty M. v. Comm'r of Soc. Sec.*, No. 19-cv-1023, 2020 WL 1874109, at *8 (C.D. Ill. Apr. 15, 2020) ("That the ALJ did not adopt Dr. Puestow's opinion verbatim is of no

10

moment; the final determination of RFC is an issue reserved to the Commissioner.")). Here, the ALJ gave "great weight" to the opinions of the state agency consultants; the ALJ did not adopt their opinions wholesale. Nor is it clear that the ALJ's determination is inconsistent with the narratives. To say that a claimant would be able to focus to complete tasks requiring 2 to 3 steps but would have increasing difficulty with more complex tasks is not to say that the claimant can only perform work requiring no more than 2 or 3 steps. In fact, it suggests the opposite—that the claimant could complete more complex tasks albeit with "increasing difficulty." This is just another way of saying that the claimant is limited to understanding, remembering, and carrying out very short and simple instructions which both state agency consultants found Armstrong could do without significant limitation.

Further support for the RFC assessed by the ALJ is provided by the opinion of the consultative examiner, Dr. Steve Krawiec, a licensed psychologist who performed an evaluation of Armstrong in September 2017. Dr. Krawiec concluded from his examination that Armstrong "has adequate cognitive capacity to understand and carry out simple job instructions." R. 533. Dr. Krawiec also stated that Armstrong's "mental health difficulties conceivably could interfere with her doing a good job of persisting at tasks and maintaining adequate pace." *Id.* But even if that part of his opinion is accepted, the fact that a person's mental health difficulties "conceivably could interfere with her doing a good job" does not mean that they would interfere or that the person cannot work. In other words, Dr. Krawiec did not say that Armstrong was not capable of functioning at the level determined by the ALJ.

Armstrong also criticizes the ALJ for failing to explain how a limitation of "no fast-paced production quotas" accounted for her limitations in pace. She cites *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015), for the proposition that a limitation of "no fast-paced production" to account for

moderate limitations in CPP is flawed and subject to remand. But as shown above, the ALJ did not simply limit Armstrong to fast-paced production quotas. That was only the last of several limitations intended to account for Armstrong's mental limitations. Moreover, as the Seventh Circuit recently pointed out, the court's "holding in *Varga* did not root itself in vagueness." *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020) ("To be sure, we noted that the phrase 'fast paced production' had more than one meaning. . . . But we reversed because the ALJ failed to include the claimant's significant problems concentrating in the RFC determination."). In *Martin*, the court observed that "[t]he law does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work." *Id.* (citing *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) ("As a matter of form, the ALJ need not put the questions to the [vocational expert] in specific terms—there is no magic words requirement.")). Instead of providing a glossary of adjectives for use in RFC determinations, *Martin* emphasized that what was required was that the ALJ "account for the totality of a claimant's limitations in determining the proper RFC." *Id.*

Just as in *Martin*, the ALJ in this case accounted for the claimant's mental limitations in determining her RFC. The ALJ expressly limited her to activities that the state agency consultants found Armstrong's ability to perform "not significantly limited." And by excluding "fast-paced production quotas" and further limiting her to a "low-stress job," the ALJ accounted for Armstrong's limitations in the broad functional area of pace. Although Armstrong argues the pace limitation is too vague, "there is only so much specificity possible in crafting an RFC." *Id.* Given the limitations and imprecision of language and the uncertainty inherent in mental limitations, the ALJ's RFC assessment reasonably accounted for Armstrong's limitation in pace.

12

Case 1:20-cv-00356-WCG   Filed 03/24/21   Page 12 of 16   Document 22

The state agency consultants also noted in the MRFC forms they completed that Armstrong would be "moderately limited" in several other areas, including understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and responding appropriately to changes in the work setting. R. 161–63, 179–80. Armstrong contends that the ALJ erred by failing to account for these limitations in the RFC.

To address this argument, it is important to note what "moderately limited" means. It does not mean that the claimant is unable to perform the activity. According to the Social Security Administrations Program Operations Manual System (POMS), the evaluator is to check the box for "moderately limited" "when the evidence supports the conclusion that the individual's **capacity to perform** the activity is **impaired**." POMS DI 24510.063(B)(2) (bold in original). The POMS notes that "the **degree and extent** of the capacity or **limitation** must be described in narrative format in Section III." *Id.* (bold in original). The state agency consultants followed these instructions and explained in narrative format the degree and extent of Armstrong's capacity and limitation. Dr. Spear concluded that, despite her moderate limitations, Armstrong would "be able to focus to complete tasks requiring 2–3 steps but would have increasing difficulty w/ more complex tasks;" that she "would do better in jobs that do not require frequent public contact;" that she "should be capable of getting along with supervisors and coworkers w/ only minor conflicts;" that she "would do better in a job that did not require frequent contact w/ coworkers;" and that she would "be suitable for work that does not require changing tasks from day to day, but rather has fairly regular set of job duties and expectations." R. 150. Dr. Fiore adopted essentially the same limitations. R. 179–80. Neither concluded that Armstrong was not capable of sustained work

13

activities within the limitations set forth in their reports. But even if they had, that fact by itself would not require reversal. This is because "[a]n ALJ has 'final responsibility' for determining a claimant's residual functional capacity and need not adopt any one doctor's opinion." *Fanta v. Saul*, No. 10-2061, 2021 WL 961647, ___ F. App'x ___ (7th Cir. Mar. 15, 2021) (citing 20 C.F.R. § 404.1527(d)(2)); *see also Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("As we have stated previously, an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians.").

Viewed as a whole, the record provides sufficient support, i.e., substantial evidence, for the mental RFC assessed by the ALJ. Because the ALJ reasonably assessed all the evidence before her, including the opinion evidence, and logically explained the route she took to her conclusion, her determination must stand.

**B. Physical RFC and Exertional Level**

Armstrong also asserts that the ALJ erred in rejecting the opinions of the consultative medical examiner and the state agency medical consultants regarding Armstrong's physical limitations. Pl.'s Br. at 9, Dkt. No. 13. Dr. Kevin Rosteing, a consultative physician examined Armstrong in October 2015 and concluded that she could lift and carry 20 pounds but must keep her right arm close to her thorax because his examination revealed "what appears to be a mild rotator cuff strain." R. 524. Dr. Rosteing acknowledged, however, that an MRI would be needed to exclude a partial rotator cuff tear. *Id.* As a result of this limitation, Dr. Rosteing and the two state consulting physicians who reviewed the record, Drs. Chan and Green, concluded that Armstrong was limited to light work. The ALJ rejected this opinion and concluded that Armstrong was capable of medium work, which involves lifting no more than 50 pounds at a time and can

14

Case 1:20-cv-00356-WCG   Filed 03/24/21   Page 14 of 16   Document 22

require standing or walking six hours in an eight-hour workday.  R. 38; 20 C.F.R. § 404.1567(b); SSR 83-10.  Armstrong contends that this was error.

In concluding that Armstrong could perform a limited range of medium work, the ALJ noted that, while her BMI was over 30, her treatment notes from April 2017 indicated she was quite active.  She stated that she walked daily, exercised on the elliptical for 30 minutes, four times per week, and that she rode her bicycle when it was nice out.  R. 42.  She had minimal treatment records for physical impairments with most of the physical examinations performed as part of routine annual examinations.  In rejecting Dr. Rosteing's opinion, the ALJ noted his conclusion was inconsistent with his own examination as well as her treatment records.  Her motor strength in her upper extremities was 5/5.  R. 523.  The X-ray of her shoulder was normal, and no MRI of her shoulder was obtained because she had not complained of pain or dysfunction in her right shoulder to treatment providers.  R. 45–46.  The ALJ noted that physical examinations throughout the treatment record were also inconsistent with Dr. Rosteing's conclusion.  Most of her physical treatment was for weight loss, preventative care, or an acute issue.  R. 46.

Although Armstrong accuses the ALJ of playing doctor, in truth she was only fulfilling her role as a judge, assessing all of the evidence before her, including the opinions of experts.  Armstrong's argument reduces the role of an ALJ to rubber stamping the opinions of medical experts, even when those opinions find no substantial support in the medical record.  Her argument assumes that an ALJ is not free to reject a medical expert's opinion unless another medical expert rejects it.  But that is not the law.  Even in civil cases, jurors are free to reject an expert's opinion if they do not find it credible.  *See* FEDERAL CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT 1.21 (2017) ("The fact that such person has given an opinion does not mean that you are required to accept it.").  An ALJ does "not err or improperly 'play doctor' by examining the medical record

15

and determining that [a medical source's] conclusions were unsupported by his own notes or contradicted by other medical evidence." *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012). Moreover, "the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014); *see also* 20 C.F.R. § 416.946(c) (the development of a claimant's RFC is solely within the province of an ALJ). The ALJ has provided clear reasons supported by the record why she assigned little weight to the opinions in question. No more is required.

But even if the ALJ erred in rejecting Dr. Rosteing's opinion and that of the state agency consultants that Armstrong was limited to light work, the result would be the same. This is because two of the jobs the vocational expert identified within the ALJ's RFC assessment fell in the category of light exertion: mail clerk and pricing clerk. The ALJ relied on both of these jobs at step five of the evaluation in finding that Armstrong could perform a significant number of jobs in the national economy given her RFC. The Commissioner therefore contends that any error in finding Armstrong capable of medium work then would be harmless. To this argument, Armstrong is silent. Under these circumstances, remand is not required. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("But administrative error may be harmless: we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.").

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of March, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
